CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

MAY 05 2015

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| HAROLD GARNER, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 7:14-CV-00081 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| MARK McNAMEE, et al., | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendants. | ) |

Plaintiff Harold Garner filed this civil action against several Virginia Tech administrators after he was removed from his position as Executive Director of the Virginia Bioinformatics Institute ("VBI") at Virginia Tech. The case is presently before the court on the defendants' first motion for summary judgment. For the following reasons, the court will deny that motion.

### Statement of Facts[1]

Garner's allegations are outlined in detail in the court's memorandum opinion granting in part and denying in part the defendants' motion to dismiss. See Mem. Op., Docket No. 24 at 1-6. The court thus summarizes only the information relevant to its present decision here.

In early 2009, Garner was recruited by Virginia Tech's then-President Charles Steger for the position of Executive Director of VBI. Garner Decl. ¶ 2, Pl.'s Br. in Opp. Ex. 1, Docket No. 44. Garner negotiated the terms of his position directly with Steger. Id. ¶ 3. The final employment agreement consisted of three documents: (1) the "Terms of Faculty Offer" dated October 6, 2009; (2) the Virginia Tech Faculty Handbook; and (3) the "Steger Letter," which was drafted on October 6, 2009 and was revised and finalized on October 20, 2009. Id. ¶¶ 4-6. In the Terms of

---

[1] These facts are either undisputed, or, where disputed, are presented in the light most favorable to Garner. See See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The defendants filed the present motion before the parties had the opportunity to finish discovery. Thus, the record is currently based only on documents produced in discovery and the parties' declarations.

Faculty Offer, Garner was offered the "Functional Title" of Executive Director of VBI, as well as a tenured professorship in the Department of Biological Sciences. Id. ¶ 4, Def.'s Mot. Summ. J. Ex. A, Docket No. 39. The Terms provided for a base salary of $250,000 and an administrative supplement of $60,000, for a starting salary of $310,000. Mot. Summ. J. Ex. A.

The Steger Letter also set forth additional terms for Garner's employment. Specifically, the Steger Letter provided for (1) a lab within VBI for Garner's continued research, including moving expenses and one round-trip on the university plane for transporting DNA samples from Garner's Texas lab; and (2) a "start-up package," including (a) a "one-time" equipment allocation of $500,000, available for three years from Garner's start date; (b) $500,000 annually to fund salaries for laboratory staff; and (c) $500,000 annually to fund salaries for "key researchers." Garner Decl. ¶¶ 9-14; Mot. Summ. J. Ex. B at 1-2.

According to Garner, Steger offered him this "start-up package" in lieu of an endowed professorship, and it "was critical to his accepting the Executive Directorship of VBI, because without it, [he] would be unable to continue his own research and thereby maintain and advance his professional standing in the academic and scientific communities." Garner Decl. ¶ 11. Garner asserts that his role as Executive Director also afforded him a $50,000 annual travel budget and a $100,000 annual discretionary fund, as well as two executive assistants to help him in leading VBI and in conducting his own scientific research. Id. ¶ 16. Garner began to serve as Executive Director of VBI in November 2009. Id. ¶ 17.

In August 2011, VBI was audited. Id. ¶¶ 18-19. In early March 2012, the auditors sent Garner a draft report of their findings, which alerted Garner for the first time that they had concluded that he had violated certain conflict of interest rules. Id. ¶ 20. Garner objected to these findings. Id. ¶¶ 20-22. On March 8, 2012, Defendant Robert Walters, Virginia Tech Vice President for Research, met with Garner and gave him a letter indicating that he was being

2

removed as Executive Director of VBI and reassigned to Director of VBI's Medical Informatics and Systems ("MIS") division.[2] Id. ¶ 24, Mot. Summ. J. Ex C. This letter specified that "[t]here will be no salary reduction associated with this reassignment." Id. On March 10, 2012, the defendants submitted paperwork to Virginia Tech Human Resources effectuating this change. Id. Ex. G. Specifically, they requested that Garner's title be changed from "Executive Director" to "Director, Medical Informatics and Systems Division" in order to "better align Garner's appointment with departmental expectations." Id.

Following this change, Garner wrote to VBI staff, stating that "VBI has taken on new directions and is on a new trajectory, a very positive one. Going forward, I will be doing what I do best, continuing to build and lead the [MIS]." Id. Ex. D. Garner also wrote to Walters and McNamee within days of the change, stating that he was "very enthusiastic about the future of [MIS]" and confirming that the results of the audit would be held in confidence. Id. Ex. F. Several months later, however, Garner's counsel sent University Legal Counsel Kay Heidbreder an objection to his "demotion." Id. Ex. H. Garner did not invoke the grievance procedures outlined in the Handbook at any time.

On November 6, 2012, Garner signed a "Terms of Faculty Offer: Re-Appointment," which reappointed Garner to his position as Director of MIS for a period of three years, until October 2015. Id. Ex. I. That document indicated that Garner's base salary and administrative stipend would not change;[3] it also provided that the "[g]eneral terms and conditions of your appointment as outlined in your initial Terms of Faculty Offer dated October 6, 2009 and accepted on October 12,

---

[2] Garner asserts that Walters informed him that he, McNamee, and Steger had unanimously decided to remove Garner; however, Walters provided no reason for doing so beyond referencing an unspecified "risk." Id. ¶¶ 24-25. Garner claims that his successor informed VBI personnel that he had been removed for "failing" the audit. Id. ¶ 26.

[3] In fact, Garner has received a raise since he signed the "Re-Appointment." He now earns a base salary of $288,211 and receives an administrative stipend of $63,000, for a total annual salary of $351,211. See Mot. Summ. J. at 6 n.4.

3

2009 remain valid." Id. This document does not mention the Steger Letter or the financial terms contained therein.

After Garner's removal from the position of Executive Director, the University continued to provide him with $500,000 annually for "key researchers" and $500,000 annually for "laboratory funding," as set forth in the Steger Letter. On August 14, 2013, however, Garner received a letter from Jack Finney, Vice Provost for Faculty Affairs, which stated that his laboratory funding would end on June 30, 2014, because those funds "had been associated with Garner's position as executive director of VBI." Id. Ex. 10. These funds were in fact withdrawn in June 2014. Garner Decl. ¶ 39. The "key researcher" funding outlined in his initial employment contract, however, has continued uninterrupted. Id. ¶ 37. As a result of the withdrawal of laboratory funding, six people in Garner's lab were terminated, "essentially bringing productive work in his laboratory to a halt." Id. ¶ 41.

## Procedural History

Garner filed this lawsuit under 42 U.S.C. § 1983, alleging that he possessed a liberty and property interest in his position as Executive Director of VBI, and that the defendants violated his constitutional rights when they deprived him of that position without due process.

On October 9, 2014, the court dismissed much of Garner's complaint. See Mem. Op., Docket No. 24. The court held that Garner's liberty interest claim failed, because the employment action alleged did not constitute a significant reassignment "to a position outside his field of choice." Id. at 19. The court also held that the defendants, in their individual capacities, were entitled to qualified immunity on Garner's property interest claim for damages, because it was not "clearly established" that the employment action at issue had violated a protected property interest. Id. at 14. Garner's only remaining claim, therefore, is his property interest claim for prospective injunctive relief against the defendants in their official capacities.

4

In its opinion, the court emphasized that the "critical consideration" to be resolved with respect to this claim is whether, under the terms of the Handbook, Garner's change in position constituted a "severe sanction," which required that he be afforded the same due process as removal for cause, or a "reassignment," which did not. Id. at 12. Under the terms of the Handbook, "a 'severe sanction, …generally involves a significant loss or penalty… such as, but not limited to, a reduction in title, responsibilities, and salary…'" Id. at 12-13 (citing Handbook § 7.6.5). The court found that Garner had adequately alleged "both a reduction in title and responsibilities." Id. at 13. It thus stated that "[i]f the reductions [in monetary benefits] constitute a reduction in salary, then it appears the change in position would constitute a reduction in 'title, responsibility, and salary' [falling] squarely within the 'severe sanction' category." Id.

The defendants have now filed a motion for summary judgment on this issue, asking the court to find, as a matter of law, that Garner's change in position was not a "severe sanction," because his salary was not reduced. The motion has been fully briefed and was argued on March 9, 2015. It is now ripe for review.

## **Standard of Review**

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. Id. at 255; see Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

5

## Discussion

In moving for summary judgment, the defendants first argue that, as a matter of law, Garner's change in employment constituted a "reassignment," and not a "severe sanction," because his salary did not change as a result. The defendants also argue that Garner's constitutional claim was extinguished when he signed a new Terms of Faculty Offer on November 6, 2012. The court will consider each argument in turn.

### I. Garner's Salary:

According to the defendants, the laboratory funding, travel budget, executive assistance, and discretionary funding that Garner stopped receiving after his change in position do not constitute "salary" as a matter of law. At best, they argue, these items were "perquisites" provided to VBI's Executive Director, and were not part of Garner's individual compensation. The court is constrained to disagree at this stage in the proceedings.

In arguing that the benefits Garner enjoyed were not salary, the defendants rely primarily on Rodgers v. Georgia Tech Athletic Ass'n, 303 S.E.2d 467, 469 (Ga. Ct. App. 1983). In that case, Rodgers brought a breach of contract action against the Georgia Tech Athletic Association after he was removed from his position as Georgia Tech's head football coach, seeking payment of all compensation under the terms of his employment contract, which he claimed included the value of administrative assistance and travel expenses, among other items. Id. at 472. The Rodgers Court disagreed, stating that

> [t]he undisputed purposes of the services of the secretary and administrative assistant was to assist Rodgers in fulfilling his duties under the contract. Since Rodgers had been relieved of his duties as head coach of football, and thus, had no responsibilities under the contract, he had no need for these support services… Also, since Rodgers had been relieved of his coaching duties, the Association was not obligated to pay his expenses for trips to various football-related activities, these costs clearly being business-related and not in the nature of compensation.

6

Id. The Court therefore granted summary judgment in the defendant's favor as to those expenses. According to the defendants, the laboratory funding, administrative support, and travel expenses provided to Garner were likewise designed to "assist" Garner with "fulfilling his duties" as VBI's Executive Director. Thus, the defendants argue, these benefits were not part of Garner's compensation as a matter of law.

Rodgers is distinguishable here, however. In Rodgers, the Court's decision that administrative services and travel expenses were not part of the coach's compensation turned on the fact that "the undisputed purpose of [those benefits] was to assist Rodgers in fulfilling his duties under the contract," and "Rodgers had been relieved of his duties…and thus had no responsibilities under the contract." Id. Here, on the other hand, the laboratory and discretionary funding, travel budget, and administrative assistance provided to Garner were arguably intended to provide support for his own personal research, which has continued after his removal as Executive Director. See Garner Decl. ¶¶ 10-11, 40-41. Moreover, the Rodgers Court declined to grant judgment as a matter of law with respect to most of the benefits that Rodgers claimed to be entitled to in that case, including various "perquisites for which [Rodgers] became eligible as head coach" which were not expressly included in his contract. 303 S.E.2d at 471. The Court found that Rodgers might remain entitled to certain perquisites (including event tickets, parking privileges, and country club dues) even after he was removed from his position. Id. at 472. At bottom, Rodgers is less informative than the defendants suggest.

The current record reflects that the parties continue to dispute the scope and nature of the benefits conferred on Garner by his initial employment contract with the University. For example, Garner cites evidence suggesting that the laboratory funding described in the Steger Letter was provided in lieu of an endowed professorship, was intended to be available on an on-going basis, and was not designed for VIB's institutional use. See Pl.'s Br. in Opp. at 5-6. The defendants

7

point to evidence contradicting each of these assertions. See Mot. Summ. J. at 10-11. Summary judgment would be inappropriate in the face of such factual disputes.

Moreover, by focusing solely on whether laboratory funding and other perquisites formed part of Garner's "salary," the defendants read the court's earlier opinion too narrowly. The critical consideration here is whether Garner experienced a "severe sanction," entitling him to due process protections, or whether he experienced a "reassignment," which did not. Mem. Op. at 12. The Handbook describes a "severe sanction" as "a significant loss or penalty…such as, but not limited to, a reduction in title, responsibilities, and salary … imposed for unacceptable conduct and/or a serious breach of university policy." Id. at 13 (citing Docket No. 3-2 at 9) (emphasis added). Thus, although the court noted in its earlier decision that Garner's removal would appear to fall "squarely within the 'severe sanction' category" if his salary was reduced along with his title and responsibilities, id., the court did not suggest that this was the sole manner by which that removal could be considered a severe sanction. Indeed, the plain language of the Handbook reflects that "a reduction in title, responsibilities, and salary" is simply one example of "a significant loss or penalty…imposed for unacceptable conduct and/or a serious breach of university policy" constituting a severe sanction. Whether Garner's removal as Executive Director constituted a severe sanction entitling him to due process protections therefore turns on a number of disputed facts, including, but not limited to, whether Garner's salary was reduced as a result. The court cannot grant summary judgment in such circumstances.

## *II. Garner's Reappointment:*

The defendants also assert that summary judgment is appropriate, because Garner's contractual relationship with the University changed when he signed the new Terms of Faculty Offer on November 6, 2012. The defendants argue that Garner is "attempting to piggy-back a constitutional claim on an employment agreement that had been superseded by another agreement at

8

the time he lost his funding." Mot. Summ. J. at 14. The court is again constrained to disagree.

It is true that, in Virginia,

> [w]here the parties to an existing contract enter into a new agreement, completely covering the same subject-matter, but containing terms which are inconsistent with those of the earlier contract, …the effect is to supersede and rescind the earlier contract, leaving the later agreement as the only agreement of the parties on the subject.

Kennedy v. Kennedy, 83 Va. Cir. 439, *1 (Fairfax 2011) (citation omitted). This "superseding contract" doctrine is inapplicable here, however. Although Garner's claims arise from his initial employment contract with Virginia Tech, those claims are constitutional, not contractual, in nature. See Mem. Op. at 12 (explaining that, when an individual contracts with a state actor, "a contractual right not to be deprived of that benefit without good or just cause" gives rise to a constitutionally-protected property interest); see Garner Decl. ¶ 22-28 (suggesting that Garner did not receive pre-deprivation notice and opportunity to be heard); Mot. Summ. J. Ex. J (stating that laboratory funds were being withdrawn because those funds were associated with Garner's position as Executive Director of VBI).

Unlike purely contractual rights, constitutional rights cannot be extinguished or waived absent express agreement. A contractual waiver of due process rights "must, at the very least, be clear." Bowen v. N.C. Dep't of Human Res., 710 F.2d 1015, 1018 (4th Cir. 1983) (citing Fuentes v. Shevin, 407 U.S. 67, 95 (1972)) (rejecting argument that interim settlement agreement waived plaintiff's due process rights where defendant agency "does not point to any contractual provision that relinquishes [the] right to be terminated only for cause and to have a hearing that affords [plaintiff] due process"). The reappointment contract signed by Garner in November 2012 contains no language purporting to waive constitutional claims like those at issue here. Thus, even if the reappointment contract did supersede Garner's initial employment contract, that new contract did not extinguish Garner's constitutional claims.

9

## Conclusion

For the reasons stated, the defendants' motion is denied. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 5th day of May, 2015.

/s/ Glen Conrad
Chief United States District Judge