CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 17 2015

JULIA C. DUDLEY, CLERK
BY:
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| HAROLD GARNER, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 7:14-CV-00081 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| MARK McNAMEE, et al., | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendants. | ) |

Plaintiff Harold Garner filed this civil action against several Virginia Tech administrators after he was removed from his position as Executive Director of the Virginia Bioinformatics Institute ("VBI" or the "Institute") at the University. The case is presently before the court on cross-motions for summary judgment filed by the parties. Because the court finds that material factual disputes preclude judgment as a matter of law, the court will deny both motions.

## Statement of Facts

The court has summarized the facts of this case in detail on two prior occasions. See Mot. Dismiss Mem. Op. at 1-6, Docket No. 24; Mot. Summ. J. Mem. Op. at 1-4, Docket No. 54. It thus outlines only that information relevant to its present decision here.

### I. Garner's Appointment as Executive Director of VBI:

Garner served as Executive Director of VBI from November 2009 until his removal on March 8, 2012. Deposition of Charles Steger ("Steger Dep") at 9. In this position, Garner was charged with overseeing the entire Institute, including three scientific divisions, a staff of approximately 240 personnel, and a combined operating and extramural research budget of over $27 million. See Deposition of Kimberly Lynn Byrd ("Byrd Dep.") at 14-15, 20, 33. Garner's employment agreement consisted of three documents: (1) the "Terms of Faculty Offer" dated October 6, 2009; (2) the Virginia Tech Faculty Handbook; and (3) the "Steger Letter," which was

drafted on October 6, 2009 and was revised and finalized on October 20, 2009. See Deposition of Charles Steger ("Steger Dep.") at 43; Pl's Exs. 9-11. In the Terms of Faculty Offer, Garner was given the "Functional Title" of Executive Director of VBI, as well as a tenured professorship in the Department of Biological Sciences. Pl.'s Ex. 9. He received a base salary of $250,000 and an administrative supplement of $60,000, for a starting salary of $310,000. Id.

The Steger Letter set forth additional terms for Garner's employment See Pl.'s Ex. 11. Specifically, the Steger Letter provided for (1) a lab within VBI for Garner's continued research, including moving expenses and one round-trip on the university plane for transporting DNA samples from Garner's Texas lab; and (2) a "start-up package," including (a) a "one-time" equipment allocation of $500,000, available for three years from Garner's start date; (b) $500,000 "annually" to fund salaries for laboratory staff; and (c) $500,000 "annually" to fund salaries for "key researchers." Id. The Steger Letter provides that "[a]fter an appropriate start-up period, these faculty would be expected to buy out a substantial portion of their positions so funds can be freed for other purposes." Id. As Executive Director, Garner was also afforded a $50,000 annual travel budget and a $100,000 annual discretionary fund, as well as two executive assistants. Declaration of Harold Garner ("Garner Decl.") at ¶ 16; Deposition of Laurie Coble ("Coble Dep.") at 32, 56-57, 68. One of these executive assistants devoted approximately 40% of her time to Garner's personal research endeavors. Coble Dep. at 57; Byrd Dep. at 18-19.

As Executive Director, Garner was considered an Administrative and Professional faculty member, which means that his employment was governed by Section 7 of the Virginia Tech Faculty Handbook. Deposition of Robert Walters ("Walters Dep.") at 79-80; Steger Dep. at 44, 48-49; see Pl.'s Ex. 10 § 7.6 et seq. The Handbook provides that faculty members may receive a "severe sanction," which "generally involves a significant loss or penalty to a faculty member such as, but not limited to, a reduction in title, responsibilities, and salary; or suspension without

2

pay for a period not to exceed one year imposed for unacceptable conduct and/or a serious breach of University policy." Id. § 7.6.5. Individuals receiving a severe sanction are entitled to the same pre-deprivation procedures as those applicable to dismissals for cause, including prior written notice and an in-person meeting and opportunity to respond to the charges alleged. Id. §§ 7.6.4, 7.6.5. Faculty members may also be "reassigned," which involves "change in administrative title or supervisory responsibilities, reassignment to another position or department, transfer to a staff position, and/or reduction in salary commensurate with reduced responsibilities." Id. § 7.6.3. The University need not provide notice or other due-process protections before reassigning a faculty member. Id.

## *II. Audit of VBI:*

In August 2011, at the request of Defendant Robert Walters, the University's Vice President for Research, Virginia Tech performed an "advisory service review" of VBI. Garner Decl. ¶ 19; Walters Dep. at 169; Pl.'s Ex. 23. Such audits occur regularly at the University. See Coble Dep. at 42; Dean Dep. at 41-42; Steger Dep. at 91. Walters specifically requested that the auditors consider whether "Conflict of Interest/Conflict of Commitment matters are being handled appropriately within the Institute" among other objectives. Pl.'s Ex. 23. Garner cooperated fully in the audit, participating in a lengthy interview with the auditors and responding to their requests for information. Garner Decl. ¶ 19; Deposition of Sharon Kurek, Director of Virginia Tech Department of Internal Audit ("Kurek Dep.") at 44-46. Garner directed VBI faculty and staff to cooperate with the auditors as well. Id.

On February 21, 2012, the auditors met with Walters, Defendant Mark McNamee, Virginia Tech's Senior Vice President and Provost, and University General Counsel Kay Heidbreder to discuss a draft version of the audit report. Kurek Dep. at 137. Soon thereafter, the auditors sent Garner a copy of that draft, which alerted him for the first time that the auditors had

3

concluded that he had violated certain conflict of interest rules,[1] and that they were recommending he be disciplined or reported to state authorities as a result. Garner Decl. ¶ 20; Kurek Dep. 160-62, 173-75, 191-92; Pl.'s Ex. 26. Garner responded in writing, pointing out several factual errors and challenging the auditors' conclusions. Garner Decl. ¶¶ 20-22; Kurek Dep. at 144-146. Garner also discussed the report with Walters, McNamee, and the auditors during an audit exit conference on March 5, 2012. Kurek Dep. at 146-47. No one indicated that Garner might be removed as Executive Director or otherwise penalized as a result of the audit at that time. Garner Decl. ¶ 22; Kurek Dep. at 148-150.

### *III. Garner's Change in Position:*

Three days later, on March 8, 2012, Walters met with Garner and gave him a letter stating that he was being removed as Executive Director of VBI and reassigned to Director of VBI's Medical Informatics and Systems ("MIS") division. Garner Decl. ¶ 23; Walters Dep. at 217-18; Pl's Ex. 27. The letter specified that "[t]here will be no salary reduction associated with this reassignment." Pl's Ex. 27. It did not, however, provide any reason for the change. Id. According to Garner, Walters told him that he, McNamee, and Steger had unanimously decided to remove Garner due to an "unspecified risk." Garner Decl. ¶¶ 24-25. Walters, however, does not recall providing any particular justification for Garner's removal.[2] Walters Dep. at 219-20. On March 10, 2012, the defendants submitted paperwork to Virginia Tech Human Resources effectuating Garner's change in position. Pl.'s Ex. 69 at 2-3. Specifically, they requested that Garner's title be

---

[1] During the period covered by the audit, McNamee was in the process of restructuring the University's conflict of interest policy and its reporting and review process. Deposition of Jack Finney ("Finney Dep.") at 20-23, 40-41. The new policy was finalized and implemented in August 2012, nine months after the audit concluded. Id. at 50-53. Kurek admits that Virginia Tech did not prohibit certain conduct addressed by the audit prior to implementation of this new policy. Kurek Dep. at 101-102, 160-62. Kurek further stated that the "right answers" to some of the central questions covered by the audit "aren't always clear." Id. at 102-103.

[2] Although Walters does not recall providing Garner with any particular explanation, he testified that McNamee, Steger, and he agreed to remove Garner as Executive Director in order to effectuate "programmatic" changes, including shifting VBI's focus away from bioinformatics. Walters Dep. at 200-201.

4

changed from "Executive Director" to "Director, Medical Informatics and Systems Division" in order to "better align Garner's appointment with departmental expectations." Id.

The following day, Defendant Dennis Dean, the newly-appointed interim director of VBI, held a meeting with VBI's faculty, staff, and students. Dean Dep. at 66-71. Garner did not attend this meeting, though Dean invited him to do so. Id. at 62. Dean testified that he held this meeting in part "to settle down rumors" about the change in leadership at the Institute. See id. at 62 (stating that he believed it was "important that [he] raise the point that there was an audit but there was no wrongdoing…"). According to Dean, his remarks were "very laudatory about [Garner]," and that he "said no salacious comments about him, [nothing] denigrating about him whatsoever" during this meeting. Id. at 71. According to Garner, however, Dean told VBI personnel that Garner had been removed for "failing" the audit. Garner Decl. ¶ 26. Garner's wife, Kim Menier, also testified that, shortly after this meeting, Dean told her and Garner that "he had pulled together the staff of [VBI] to tell them that [Garner] had been demoted because he had failed an audit." Deposition of Kim Menier ("Menier Dep.") at 9-10.

On March 9, 2012, Virginia Tech issued a press release stating that Garner had "stepped down" as Executive Director of VBI in order to "lead the [MIS] division…and focus on his scholarly research." Def.'s Ex. E. In this statement, Walters describes the change as "progressive …for VBI and for Garner," given that "[m]edical informatics has become critically important in the past 12 months to the scientific community and to VBI." Id. That same day, Garner wrote to VBI staff, stating that "VBI has taken on new directions and is on a new trajectory, a very positive one… Going forward, I will be doing what I do best, continuing to build and lead [MIS]." Pl.'s Ex. 28. Garner also wrote to Walters and McNamee within days of the change, stating that he was "very enthusiastic about the future of [MIS]" and confirming that the results of the audit would be held in confidence. Def.'s Ex. F. Several months later, however, Garner's legal counsel sent University

5

Legal Counsel a letter formally objecting to his "demotion." Def.'s Ex. H. Garner has not invoked the post-deprivation grievance procedures outlined in the Handbook at any time.

Upon his removal as Executive Director, Garner lost control of the discretionary and travel funds afforded to him in that position, which he had previously used to support his own work as well as that of other VBI personnel. Coble Dep. at 33, 68, 71; Dean Dep. at 106; Garner Decl. ¶ 30. Garner also lost the aid of two full-time executive assistants, who had previously assisted with his duties as Executive Director and also with his own research efforts. Coble Dep. at 56-60; Garner Decl. ¶ 30. Garner now receives assistance from one non-executive level assistant, whose time must be split among all MIS faculty. Id. Garner also lost the authority to designate VBI funds to support his own laboratory. See Dean Dep. at 158-61.

On November 6, 2012, Garner signed a "Terms of Faculty Offer: Reappointment," which "reappointed" Garner to his new position as Director of MIS for a period of three years, until October 2015. That document indicated that Garner's base salary and administrative stipend would not change as a result of his reappointment;[3] it also provided that the "[g]eneral terms and conditions of [Garner's] appointment as outlined in [his] initial Terms of Faculty Offer dated October 6, 2009 and accepted on October 12, 2009 remain valid." Id. This document does not mention the Steger Letter or the financial terms contained therein.

Garner's funding was not reduced immediately following his removal as Executive Director in May 2012 or after his "reappointment" as Director of MIS in November 2012. In fact, in April 2013, approximately one year after he was removed as Executive Director, Garner, with Dean's approval, used the "key researcher" funds outlined in the Steger Letter to extend the appointments of two MIS Key Researchers for another three years. Dean Dep. at 154-55; Byrd Dep. at 64-66, 72;

---

[3] In fact, Garner has received a raise since he signed this document. He now earns a base salary of $288,211 and receives an administrative stipend of $63,000, for a total annual salary of $351,211. See Def.'s Mot. Summ. J. at 8 n.3, Docket No. 59.

6

Pl's Ex. 75 (April 8, 2013 e-mail from Garner to Byrd, asking that funding for these researchers be renewed using "the $500k/year provided to me for MIS faculty").

In early August 2013, however, Dean met with McNamee, Walters, University Counsel, and Jack Finney, the University's Vice Provost for Faculty Affairs, to discuss Garner's funding. Dean Dep. at 121-22, 133-136, 138-40. Dean testified that he initiated this meeting after Garner requested the name of his "start-up" fund be changed to "Garner Sustaining Fund." Id. at 136. At this meeting, the group decided to terminate the $500,000 in annual laboratory funding that had been provided to Garner since he was hired as Executive Director of VBI in 2009. Dean Dep. at 140-141. Garner received a letter from Finney on August 14, 2013, which explained that his laboratory funding would end on June 30, 2014, the end of the fiscal year. Finney explained that this "start-up funding" had been "associated with [Garner's] appointment as Director of [VBI]," and that it "[t]he start up package referenced in [the Steger Letter] was designed to assist in the initiation of [his] research program at Virginia Tech and not as permanent base support" for his laboratory. Pl.'s Ex. 29.

In accordance with Finney's letter, Garner's laboratory funding was withdrawn in June 2014. Garner Decl. ¶ 39. The "key researcher" funding, was also initially outlined in the Steger Letter, has continued uninterrupted. Id. ¶ 37. As a result of the withdrawal in funding, Garner's laboratory is staffed with fewer individuals than when he was Executive Director. See Garner Decl. ¶ 41; Dean Affidavit ¶ 11. According to Garner, the funding withdrawal has had "a devastating effect on [his] ability to engage in research to maintain and advance [his] position and reputation as a scientist, to attract grant funding to support [his] laboratory independently, and to maintain [his] academic career." Id. ¶ 40.

## Procedural History

Garner filed this lawsuit under 42 U.S.C. § 1983, alleging that he possessed a liberty and property interest in his position as Executive Director of VBI, and that the defendants violated his

7

constitutional rights when they deprived him of that position without due process. On October 9, 2014, the court dismissed much of Garner's complaint. See Docket No. 24. The court held that Garner's liberty interest claim failed, because the employment action alleged did not constitute a significant reassignment "to a position outside his field of choice." Id. at 19. The court also held that the defendants, in their individual capacities, were entitled to qualified immunity on Garner's property interest claim for damages, because it was not "clearly established" that the employment action at issue had violated a protected property interest. Id. at 14. Garner's only remaining claim, therefore, is his property interest claim for prospective injunctive relief against the defendants in their official capacities.

In its October 9, 2014 opinion, the court emphasized that the "critical consideration" with respect to this claim is whether, under the terms of the Handbook, Garner's change in position constituted a "severe sanction," which required that he be afforded the same due process as removal for cause, or a "reassignment," which did not. Id. at 12. Under the terms of the Handbook, "a 'severe sanction, …generally involves a significant loss or penalty… such as, but not limited to, a reduction in title, responsibilities, and salary…'" Id. at 12-13 (citing Handbook § 7.6.5). The court found that Garner had adequately alleged "both a reduction in title and responsibilities." Id. at 13. Thus, "[i]f the reductions [in monetary benefits] constitute a reduction in salary, then it appears the change in position would constitute a reduction in 'title, responsibility, and salary' [falling] squarely within the 'severe sanction' category." Id.

On February 6, 2015, before discovery was completed, the defendants filed a motion for summary judgment on this issue, arguing that Garner's change in position constituted a "reassignment" as a matter of law because his salary was not reduced as a result. On May 5, 2015, the court denied this motion, finding that the record at that time "reflect[ed] that the parties continue to dispute the scope and nature of the benefits conferred on Garner by his initial

8

contract with the University." Docket No. 54 at 7. The court also noted that "'a reduction in title, responsibilities, and salary' is simply one example of 'a significant loss or penalty…imposed for unacceptable conduct and/or a serious breach of university policy' constituting a severe sanction." Id. at 8. Thus "[w]hether Garner's removal as Executive Director constituted a severe sanction entitling him to due process protections [] turns on a number of disputed facts, including, but not limited to, whether Garner's salary was reduced as a result." Id.

The parties filed cross-motions for summary judgment on May 15, 2015. These motions have been fully briefed, and the court heard argument on each motion on June 23, 2015. The motions are now ripe for review.

## Standard of Review

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the nonmovant." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003). At the summary judgment stage, the court cannot "weigh[] the evidence or assess[] the witnesses' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). Instead, the court must consider only whether a reasonable trier of fact "could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## Discussion

As the court has stated on previous occasions, the critical inquiry in this case "is whether Garner experienced a 'severe sanction,' entitling him to due process protections, or whether he experienced a 'reassignment,' which did not." Docket No. 54 at 8; see also Docket No. 24 at 12.

9

Again, a "severe sanction" is "a significant loss or penalty to a faculty member such as, but not limited to, a reduction in title, responsibilities, and salary; or suspension without pay for a period not to exceed one year imposed for unacceptable conduct and/or a serious breach of University policy." Pl.'s Ex. 10 § 7.6.5. A "reassignment," on the other hand, is "a change in administrative title or supervisory responsibilities, reassignment to another position or department, transfer to a staff position, and/or reduction in salary commensurate with reduced responsibilities," which is not intended as a penalty for wrongdoing. Id. § 7.6.3. Upon reviewing the record, the court finds that a number of material factual disputes preclude summary judgment on this issue.

For example, the parties dispute whether Garner's change in position was "imposed for unacceptable conduct and/or a serious breach of University policy" – namely, whether he was removed a result of the audit. At the outset, the court notes that Garner's removal occurred only three days after Virginia Tech officials met to discuss the results of the VBI audit, which concluded that Garner had violated conflict of interest rules. This timing certainly suggests that the two events were related. The defendants maintain, however, that the change in leadership was not intended as a "disciplinary action." Walters Dep. at 217. Instead, the defendants insist that "Walters reassigned Garner in order to change VBI's programmatic direction and move away from bioinformatics." Def.'s Mot. Summ. J. at 4, Docket No. 59; see Walters Dep. at 197, 201. The court finds this explanation difficult to square with the University's public statements immediately following Garner's removal, which describe bioinformatics as "critically important" to VBI. See Def.'s Ex. E. Moreover, Garner maintains that Walters told him that he was being removed due to "risk." Garner Decl. ¶¶ 24-25. Garner has also produced evidence suggesting that Dean told other VBI personnel that he had been removed for "failing" the audit. See Garner Decl. ¶ 26; Menier Dep. at 9-10. Dean, on the other hand, has testified that he told VBI personnel that there "was an audit but there was no wrongdoing." Dean Dep. at 62. Without considering the credibility of these witnesses or otherwise

weighing the evidence, the court simply cannot decide whether Garner's removal was a "severe sanction" intended as punishment "for unacceptable conduct and/or a serious breach of University policy."

The parties also dispute whether Garner experienced "a reduction in title, responsibilities, and salary" fitting squarely within the Handbook's definition of a "severe sanction." See Pl.'s Ex. 10 § 7.6.5. The parties agree that Garner's title and responsibilities changed when he was removed from the position of Executive Director; they also agree that his salary did not change as a result of this change. The parties disagree, however, as to whether Garner's loss of laboratory funding was connected to his demotion, which may suggest that it was a severe sanction.

The defendants argue that the laboratory funding provided for in the Steger Letter was not intended to support Garner's laboratory indefinitely. According to the defendants, Virginia Tech, like other universities, limits the duration of all "start-up" packages. See Dean Aff. ¶ 9; Finney Dep. at 98; McNamee Dep. at 35. The defendants contend that Garner knew or should have known these funds would be limited in duration, because he has negotiated numerous "start-up" packages over the course of his career. See Garner Dep. at 98-100. The defendants thus maintain that the decision to terminate Garner's laboratory funding occurred as a matter of course, and was entirely unrelated to the earlier decision to remove Garner as Executive Director. The defendants thus argue that the removal of Garner's laboratory funding in 2013 cannot transform his 2012 reassignment into a severe sanction.

The defendants' position is not without merit. Neither, however, is Garner's. According to Garner, the laboratory funding set forth in the Steger Letter was intended to provide ongoing support for his personal research. See Garner Decl. ¶ 10. Garner emphasizes that the Steger Letter itself does not explicitly limit the duration of those funds, even though other financial terms in that letter are so limited. See Pl.'s Ex. 11. When Garner was removed as Executive Director, he lost the

11

ability to designate VBI funds to support his own laboratory, essentially permitting the defendants to remove his funding at their leisure. Thus, Garner contends, he experienced a severe sanction at the time of his demotion, despite the fact that the defendants did not follow through by withdrawing his funding for over a year.

In sum, evidence in the summary judgment record supports both parties' positions. The court thus cannot conclude that either is entitled to judgment as a matter of law.

## Conclusion

For the reasons stated, the parties' motions for summary judgment are denied. This matter will be set down for a bench trial, at which the court intends to make use of an advisory jury. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 17th day of July, 2015.

*/s/ Glen Conrad*

Chief United States District Judge